JOSEPH TARAULT v. JOHN SEIP AND CAROLINA LAND AND
LUMBER COMPANY.

(Filed 13 March, 1912.)

1. Deeds and Conveyances—Covenants—Intention—Interpretation.

Covenants in a deed are construed most strongly against the
grantor, and any language evidencing such an intention is suffi-
cient.

2. Deeds and Conveyances—Fraud and Deceit—False Representa-
tions—Evidence.

In order to recover damages for fraud in the procurement of a
sale of lands, there must be false representations as an induce-
ment of purchase, and shown to have been the reason for making
the contract, and relied on.

3. Same.

Actions for fraud and deceit rest in the intention with which
the representation is made, and not upon the representations
alone.

4. Same—Scienter—Burden of Proof.

When damages are sought in an action by the vendee of lands
for fraud and deceit in the procurement of the purchase, claiming
that certain lands were represented as being included in the
description in the deed, when in point of fact they were not, the
burden of proof is on the vendee relying upon the fraud to prove
the *scienter* of the vendor; and the principle holding the vendor
liable for his statement, when the representation is a part of
the warranty, whether it be true or not, has no application.

5. Same—Nonsuit.

In the contemplation of purchase of a large tract of lands
the vendee sent its agents for the purpose of examination,
who were informed by the agent of the vendor that he had
not been over the lands and was unacquainted with its bounda-
ries. The vendor's agent was sick and only showed certain lands
in cultivation, and sent another person with the vendee's agents
to show them the boundaries, who, at a certain place, said, "This
ditch marks the line," whereas the ditch only marked a part of
the boundary and excluded the lands in controversy, which be-
longed to an adjoining owner. The vendee's agents were given
full opportunity to examine the lands, and could have ascer-
tained that the lands in controversy were not included in the

boundaries subsequently given in the deed: *Held,* no evidence in an action for damages for fraud and deceit, and a motion for nonsuit should be granted.

ALLEN, J., dissenting.

APPEAL from *Cline, J.,* at September Term, 1911, of CURRI-TUCK.

Civil action. The plaintiff sued to recover on a note for $10,000, given for the purchase money of certain lands. The defendant pleaded counterclaims which are embodied in these issues:

1. Did the plaintiff covenant to warrant and defend the title to the lands described in the answer? Answer: Yes.

2. Were the defendants ousted from the lands, or any part thereof, as alleged in answer? Answer: Yes; 17-80 of the Cox lands.

3. What damage is defendant entitled to recover for 17-80 of Cox land, named by M. B. Mott and others, for value of land and attorney's fees and cost of witnesses? Answer: $2,055.35 and interest from 1 January, 1908.

4. What damage are defendants entitled to recover because of the time of their employers in defending the Mott suit? Answer: $150.

5. What damages are defendants entitled to recover for the 3-80 of the Major John Cox lands? Answer: $900.

6. Did plaintiff represent to defendants that the line of his lands ran to the ditch which is the southern boundary of the A. M. Willey land? Answer: Yes.

7. Were those representations false and fraudulent? Answer: Yes.

8. Were those representations relied upon by defendant, and were they calculated and did they deceive the defendant Seip? Answer: Yes.

9. What damages are defendants entitled to recover of plaintiff by reason of said representations? Answer: $10,000, with interest from 23 August, 1902, at 6 per cent.

10. What amount is due the plaintiff on the note of $10,000? Answer: $10,250, with interest at 6 per cent from 26 July, 1906, on $10,000.

His Honor allowed the counterclaims embodied in the third issue, $2,055.35, with interest from 1 January, 1908, and in the ninth issue, $10,000, with interest from 23 August, 1902, both aggregating $17,925.56, and rendered judgment, after satisfying and discharging the purchase money note, against the plaintiff for $4,508.89. For some reason not set out, his Honor set aside the fourth and fifth issues and declined to allow the amounts as a counterclaim to the defendants. •

From the judgment rendered the plaintiff appealed.

*Pruden & Pruden and S. Brown Shepherd for plaintiff.*
*J. C. B. Ehringhaus and E. F. Aydlett for defendants.*

BROWN, J. There are only two. matters presented for our consideration upon this appeal and they relate to the counterclaims passed upon in the third issue and in the sixth, seventh, eighth, and ninth issues.

1. It is contended that the clause in the deed from plaintiff to Seip is not sufficient to create a covenant of warranty of title to the lands described in the deed, and that therefore defendants cannot recover on the third issue. The language of warranty is as follows:

. "And we, Joseph Tarault and Richard E. Norton, the said grantors, do, for ourselves and our heirs, executors, and administrators, covenant with the said grantee, his heirs and assigns, that at and until the ensealing of these presents we were well seized of the above described premises as a good and indefeasible estate in fee simple, and have good right to bargain and sell the same in manner and form as above written; that the same are free and clear of all encumbrances whatsoever, except taxes thereon, and that we will warrant and defend said premises, with the appurtenances thereunto belonging, to the said grantee, his heirs and assigns, forever, against all lawful claims and demands whatsoever, except taxes."

The learned counsel for plaintiff evidently place but little reliance upon this contention, for they cite us no authority and give no reason in support of it. They content themselves with simply calling our attention to it in their brief. We presume

that the theory upon which the exception was taken is, the words "title to" being omitted from the warranty clause renders it insufficient as a covenant of warranty of title. The position is untenable. Covenants are construed most strongly against the grantor, and any language evidencing such an intention is sufficient. 11 Cyc., 1076 and 1077; 14 Century Digest, "Covenants," sec. 1.

2. The defendants further contend that they were induced to purchase the land by the willful and false representations of the plaintiff in respect to the boundary, whereby the plaintiff was cheated out of about 1,000 acres of land. This counterclaim is embodied in the sixth, seventh, eighth, and ninth issues. The evidence taken in its most favorable light for defendants tends to prove these facts.

H. C. Hosier of Ohio, a stockholder of the defendant Carolina Land and Lumber Company, which company the defendant John Seip organized to take over the land purchased by him of the plaintiff Tarault, together with A. B. Lukens and E. S. Skilder of Norfolk, and O. D. Jackson, the real estate broker negotiating the sale, went to look over the land before the purchase. The plaintiff Tarault was at home sick, suffering from asthma, and showed the parties only the cultivated land, but was unable to show them the boundaries of all the land. He also stated to the purchasers that he did not know the boundaries of the land and had never been around it, which testimony is uncontradicted. He got a colored man to go with the party to show the lines. When they came to a ditch 6 feet wide Jackson and the colored man both said, "We are now on the Tarault property," and that "this ditch marks the line." The party remained in the vicinity for several days, investigating the land, and later Mr. Seip came from Ohio and closed the transaction. The lands sold to Seip covered some 9,192 acres in all and the purchase price was $70,000. Four or five years afterwards it was found that this ditch did not mark the boundary of the property, and that there was between the ditch and the true Tarault line something like 1,000 acres, which belonged to one Willey, and was later recovered by Willey in a suit. In surveying this boundary it was found that the ditch

was right at the boundary in one place, and it was further established that the line between Willey and Tarault was well defined and marked, Willey having cut it out every few years. This testimony is corroborated by A. B. Lukens and O. D. Jackson. Jackson was not sure whether he and the colored man stated the line was at the ditch or near it, but said that they all took it for granted that the ditch was the line. It is further in evidence that this Willey land was well timbered. Upon this testimony of defendants the plaintiff moved for a nonsuit on the defendants' counterclaim as to fraud, which motion was refused. The plaintiff then introduced one Sears, who testified that he was present when Tarault told Jackson, Hosier, and Lukens that he had been only half a mile in the swamp and did not know where the lines were. Deposition of Tarault was introduced, further stating that he had told the defendants that he had not been over the property and did not know where the lines were, and did not know anybody who did, and that he told them to take their time and look at the lines and the records and if they did not want it, it was all right; he had just as lieve keep it. Witness Lukens was recalled and stated that he did not remember Tarault's saying that he did not know where the lines were. Upon the close of the testimony the plaintiff renewed his motion as to nonsuit, which motion was refused. The plaintiff then asked the court to charge that upon all the evidence they should answer the sixth, seventh, and eighth issues "No" and the ninth issue "Nothing."

It is admitted that the boundaries of the deed do not cover the Willey land, and therefore the defendants cannot recover upon the warranty as to that. The cause of action the defendants seek to establish is based upon the allegation that the plaintiff represented to defendants that the Willey land was included in his own boundaries, that such representation was knowingly false and was made by plaintiff with the false and fraudulent purpose of inducing defendants to purchase, and that they made the purchase in consequence of such representations, relying upon them.

Accepting the doctrine that the principle that false representations as to material facts knowingly and willfully made as

an inducement to a contract applies to contracts and sales of land as well as personalty, we are unable to find in the record any evidence of those necessary elements which are essential to constitute actionable fraud.

In order to constitute such, there must be false representations as to material facts, knowingly and willfully made as an inducement to the contract. Such representations must be shown to have been the reason for making the contract and that they were reasonably relied upon by the other party.

*May v. Loomis,* 140 N. C., 352. In this often cited case *Mr. Justice Hoke* lays down these principles and quotes abundant authority sustaining them. Applying them in this case, we find no evidence at all sufficient to sustain the allegations of the answer or the findings of the jury.

The plaintiff told the purchasers that he did not know the boundaries. He told them that Sam Jones, the negro, was familiar with the lines. There is not a scintilla of evidence that this statement was made to deceive. All the evidence shows that plaintiff was sick, and in sending the negro with the purchasers he acted in good faith. The ditch did constitute a part of the boundary at one point and there is no evidence that the negro Jones acted with any fraudulent purpose when he said, "This ditch marks the line." That he made a mistake is not sufficient. Erroneous statements made by the vendor in the sale of land as to the location of a boundary are not sufficient, standing alone, to impeach the transaction for fraud. We think that *Gatlin v. Harrell,* 108 N. C., 487, lays down the proper rule for cases of this kind. The facts in that case are practically the same as those in the case at bar. There the vendor pointed out the corners and lines on several occasions, and it turned out that these boundaries were not the correct one, and the opinion, after referring to the fact that the court below had granted nonsuit on the facts, said:

"We think the suggestion of the court was well founded. The whole of the evidence, accepted as true, did not in any reasonable view of it prove the alleged fraud and deceit. The proof was that the defendants pointed out to the plaintiff certain corners and line trees of the tract so sold, and that these, or some

of them, were not the true ones; but there is nothing to prove that the defendants knew that they were not the true ones, nor that they fraudulently intended to mislead, deceive, and get advantage of the *feme* plaintiff. The proof, further, was that the defendants said the tract had been surveyed and contained 115 acres. There was nothing to prove that it had not been surveyed, or that it did not contain that quantity. The mere fact that the defendants pointed out corners and lines not the true ones could not of itself prove fraud and deceit, especially in the total absence of proof that the tract conveyed did not contain the quantity of land specified in the deed as containing 115 acres, more or less. Indeed, there was no proof, so far as it appears, as to the quantity of land the defendants contracted to sell to the *feme* plaintiff, or what quantity they conveyed, otherwise than as shown by the deed put in evidence."

"There was no proof to sustain the material allegations of the complaint. In the absence of such proof, it is obvious the plaintiffs could not recover, and the court hence properly intimated that they could not. There must be *probata* as well as *allegata.*"

In our case there was nothing said or done to willfully mislead the purchasers, nor was artifice used to prevent a full inquiry. The purchasers remained at the property several days and satisfied themselves. They were told by the vendor that he did not know the boundaries, and all the vendor did was to give them what means he had at hand to aid them. He sent a colored man to show the boundaries, and, so far as it appears, thought the colored man knew the boundaries. It turns out that the ditch was actually at the true boundary in one place, and it was not a great mistake for the colored man to have assumed that this large ditch, starting at the boundary and running a long distance, was the real boundary. Being swamp land, with the necessity for boats to cruise in it, there was much less opportunity for any one to be familiar with the true lines. Again, the evidence discloses that the lines were well marked and cut, and a little investigation on the part of the purchasers would have acquainted them with the true boundaries. If purchasers make mistakes and suffer loss by reason of such a state of facts

as is disclosed here, it must be attributed to their own lack of proper and diligent inquiry, and they should not be heard to say, years afterwards, that they were fraudulently induced to make the purchase. Moreover, the evidence here does not show sufficiently that the defendants purchased this large tract of land, relying upon the testimony of the agent Jackson and the negro, in regard to this particular boundary.

An essential element of actionable fraud is the *scienter* or knowledge of the wrong on the part of the vendor. Where the representation is made as a part of the warranty, the vendor is held liable for his statement, whether he knew it to be true or not, but where the action is for fraud the burden is upon the party setting it up to prove the *scienter*. This distinction is well made by *Chief Justice Pearson* in *Etheridge v. Palin*, 73 N. C., 216, and is well supported by numerous authorities in this and other States. This Court said in *Tilghman v. West*, 43 N. C., 183: "Nor can fraud exist where the intent to deceive does not exist, for it is emphatically the action of the mind that gives it existence." And in *Hamrick v. Hogg*, 12 N. C., 350, *Judge Henderson* says: "It is not sufficient that the representation be false in point of fact; the defendant must be guilty of a moral falsehood. The party making a representation must know or believe it to be false, or, what is the same thing, have no reason to believe it to be untrue." The action for fraud and deceit rests in the intention with which the representation is made, and not upon the representations alone.

This doctrine is generally held by all courts in this country and in England. *Berry v. Peak*, L. R., 14 App. Cs., 337; *Byard v. Holmes*, 34 N. J. L., 296; 2 Kent Com., 484; *Shrakelt v. Bickford*, 74 N. H., 57.

The case of *Shell v. Roseman*, 155 N. C., 90, is a case in point in which the evidence of intentional deceit is clear and full, as pointed out by *Mr. Justice Allen* in the opinion of the Court.

The judgment of the Superior Court is reversed upon the sixth, seventh, eighth, and ninth issues and the motion of plaintiff to nonsuit defendants upon that counterclaim is allowed. Let judgment be entered in the Superior Court for plaintiff in

TARAULT v. SEIP.

accordance with this opinion, to wit, for $10,250, with 6 per cent interest from 26 July, 1906, on $10,000, subject to a credit of $2,055.35 bearing 6 per cent interest from 1 January, 1908.
    Reversed.

ALLEN, J., dissenting: On 23 August, 1902, the plaintiff executed a deed to the defendant Seip, purporting to convey about 9,000 acres of land for $70,000, in which the covenant of warranty warranted "the premises." The defendant paid all of the purchase price in cash, except $38,500, for which he executed four notes, secured by a mortgage on the land, the last note falling due on 25 August, 1905, and being for $10,000.

The defendant paid all of said notes except the last, and this action is for the purpose of enforcing payment of it.

The defendant resists payment because he contends that he was induced to buy the land upon the representation that 1,000 acres, which were pointed out, were embraced in the purchase, when they were in fact owned by another person.

A jury has returned a verdict, under instructions to which there is no exception, finding that the plaintiff made the representation in the sale of the land; that it was false and fraudulent; that it was relied on by the defendant; that it was calculated to deceive him and did so, and that the defendant has been damaged thereby to the amount of $10,000, with interest thereon from 23 August, 1902, and this Court sets the verdict aside upon the ground that there was no evidence to support the verdict.

I cannot concur in the conclusion reached, and think a careful reading of the evidence shows that every element entering into a fraudulent transaction was fully proven.

It must be remembered that the plaintiff instituted this action, and that he is invoking the equitable jurisdiction of the Court to enable him to foreclose a mortgage.

If the verdict of the jury is supported by evidence, the plaintiff has falsely represented 1,000 acres of land, which he did not own, to be within the boundaries of the deed he made to the defendant; the defendant relied on the representation, which was calculated to deceive and did deceive, and the plaintiff is now asking a court of equity to foreclose a mortgage given to

secure a note, which is made up of the purchase price of the 1,000 acres. I say it is so made up, because the rest of the purchase price has been paid, and the jury has, in effect, found that the 1,000 acres is worth $10,000.

If the law will permit the plaintiff to recover under such circumstances, we must reject the statement that "law is the manifestation of the conscience of the Commonwealth."

I think, tested by the rules of the common law, or by equitable principles, the plaintiff must make good his representation.

Suppose we consider the evidence in the strongest light against the defendant, and require him to furnish evidence of fraudulent conduct upon the part of the plaintiff and actual knowledge that the representation was false.

If there is evidence of these facts, the verdict cannot be disturbed under the rules laid down in the opinion of the Court.

(1) The plaintiff was the owner of the land, and was selling it. The fair inference is that he investigated the boundaries before he bought.

(2) The land had been surveyed before he bought, and the line plainly marked. Is it not legitimate to argue that he knew these facts?

(3) The agent of the defendant, who was examining the land, was a nonresident and had never been on the land before. He was, therefore, easily misled as to the boundary.

(4) He asked the plaintiff to furnish some one who could point out the boundaries.

(5) The plaintiff sent for Sam Jones, a negro, who was his employee and lived on the land, and said he was *familiar with the lines,* and would go with them and point them out.

(6) Sam Jones and a Mr. Jackson, who was the agent of the plaintiff in making the sale, went with the agent of the defendant, and when they reached a certain ditch, both said, "We are now on the Tarault land."

(7) They were not on the Tarault land when they reached the ditch, and there were in fact 1,000 acres between the ditch and the line of the Tarault line, belonging to another person.

(8) The defendant's agent relied on the representation.

Mr. Jackson, the agent of the plaintiff to make the sale, testified, among other things : ·

"I live in Norfolk and am a dealer in timber and mineral lands, and in the sale of the property from Tarault to Seip I acted in the capacity of broker, and sold the same upon a percentage agreement, to be paid by Mr. Tarault. I accompanied Mr. Seip's representatives, Messrs. Hosier and Lukens, from Norfolk, about the 5th or 6th of August, 1902. Mr. Tarault furnished us a colored man as a guide to show us the timber land. In crossing a well-marked ditch, we took it for granted that that was the line, as I so understood it. It was understood by all of us that we were on Mr. Tarault's land after we crossed a well-marked ditch. ·I do not remember who stated this ditch to be the line, whether the colored man or myself.· I had been informed before that the ditch was the line. In discussing the land, we all talked of it as being Tarault's property. I think this was Lukens' and Hosier's first trip to North Carolina, and the first time on that property, and I should say that they had no knowledge of where the line was, and no other information, except such as they got from the colored man sent by Mr. Tarault and myself. The colored man stated that it was Mr. Tarault's land and timber after they got across the bridge and into the timber. I am unable to say whether the colored man or myself made the statement that the ditch was the line, or very near the line, of the Tarault land, but I recall clearly that the property near the ditch or shortly beyond the ditch was represented as Mr. Tarault's land. My recollection is very clear as to this ditch being considered the line, and we all took for granted that it was."

(9) The agent reported to the defendant, and this was the basis of his purchase.

(10) Sam Jones was not produced as a witness by the plaintiff, and his absence was not accounted for.

(11) The plaintiff was examined as a witness and denied sending any one to point out the lines.

(12) He conveyed land inside the boundaries of the deed, which he did not own, and when sued on his warranty, tries to evade liability by saying he warranted the "premises" and not the title.

No statement I have made in this enumeration can be disputed, and I think I have seen men convicted of high crimes, involving guilty knowledge, on less.

And why should a court be astute to find a way to relieve the plaintiff? No one questions the fact that the representation was made and that it was false. The defendants' agents swear they relied on them in making the trade, and when the trade was consummated the plaintiff received pay for 1,000 acres of land he did not own, by reason of the false representation.

In the opinion of the Court it is suggested that the defendant was negligent in not having the land surveyed, and that he ought not to be permitted to say, after the lapse of four or five years, that he was deceived.

The first suggestion is met by what is said in *Walsh v. Hall,* 66 N. C., 241, "The transaction was like hundreds of others in the country, which are entirely fair and honest, and we do not regard the want of a survey as laches on the part of the defendant. A large majority of the sales of land in the State are completed by the delivery of a deed copied from some previous deed, and surveys are not generally made unless there is some dispute about the boundaries. Where the grantor has been in the possession of land for a number of years, exercising acts of ownership, his positive assertion as to location may be reasonably relied upon without a survey," and the second by the evidence.

H. C. Hosier, an agent of the defendant and in charge of the land, testified: "I never knew Mr. Willey claimed the land until I got the skidder in there and began to cut the timber. Don't remember the date, but it was four or five years after we got the deed, and somewhere about the year 1906."

Mr. Willey was the owner of the 1,000 acres, and this action was commenced in 1906.

Again the Court says the evidence does not show sufficiently that the representation was relied on.

H. C. Hosier testified: "When Mr. Jackson and the colored man pointed out to me the ditch as the Tarault line, I firmly believed it was the line, and did not know anything else until Mr. Willey told us to get off. I had no other information

about the line, and Mr. Tarault knew that I had no other information, for this was my first trip to North Carolina. The value of the land we purchased, running to the Abbott line, was from $10,000 to $15,000 less than if we had gotten the land shown us."

A. B. Lukens, another agent of defendant, who was on the land when the representation was made, testified: "Mr. Jackson asked Mr. Tarault for some one to show us the southern boundary of the lands. Mr. Tarault sent for the negro, Sam Jones, who lived on his place. Tarault said he was familiar with those lines. We crossed a ditch from 4 to 6 feet in width. Mr. Jackson said, 'We are now on the Tarault property,' and the negro gave us to understand that the ditch was Mr. Tarault's line. We accepted that ditch as the southern boundary of that land. We reported to Mr. Seip our examination of the matter. Mr. Jackson knew that Mr. Seip would be associated with us if we found the proposition to interest us. It was understood that Mr. Seip should come down and close up the transaction, take deeds, etc. Mr. Seip took a deed on our report, and turned it over to us, and it was recorded. Mr. Tarault went with us on the cultivated land, but not on the timbered land. He was greatly troubled with asthma at the time. We reported to Mr. John Seip the investigation of the land as set out in his evidence, and Mr. Seip bought upon that report, and we made the report for him upon the representation of the lands as made to us."

The evidence of Jackson, agent of the plaintiff, which has been referred to, shows clearly that the agents of the defendant relied on the representation.

I do not question the ruling in *Gatlin v. Harrell*, 108 N. C., 487, which is said in the opinion to lay down the proper rule for cases of this kind, but I respectfully insist that it has no bearing on the question before us. In the *Gatlin case* the representation was that the land had been surveyed, and contained 115 acres, and the action was dismissed because there was no evidence that the land had not been surveyed and did not contain 115 acres; while in our case it is not denied that the representation was false.

If, therefore, the strict rules of the common law are to be applied, and the defendant is required to prove actual knowledge, I think he has come up to the full measure of the law.

The case is not, however, at law, but in equity, where the maxim prevails that, "He who seeks equity must do equity," and "He who comes into equity must come with clean hands," which is illustrative of the principle that nothing can call forth a court of equity into activity but conscience and good faith.

Mr. Pomeroy, in his work on Equity Jurisprudence, after stating that no representation is fraudulent at law, unless it is made with actual knowledge of its falsity, or under such circumstances that the law must necessarily impute such knowledge to the party when he makes it, points out that the rule is different in equity. He says, section 885: "It is fully settled by the ablest courts, English and American, that there may be actual fraud—not merely constructive fraud—in equity, without any feature or incident of moral culpability; that the actual fraud consisting of misrepresentation is not necessarily immoral. A person making an untrue statement, without knowing or believing it to be untrue, and without any intent to deceive, may be chargeable with actual fraud in equity"; and again in section 886: "If a person makes an untrue statement, and has at the time no knowledge of its truth, and even has no *belief* in its truth, he is chargeable with fraud in equity as well as in law. Making a statement which the party does not believe to be true is only slightly removed in culpability from the making a statement which the party knows to be false"; and in section 887: "It is settled in equity by an overwhelming array of authority that where a person makes a statement of fact, which is actually untrue, and he has at the time no knowledge whatever of the matter, he is chargeable with fraud, and his claim to have believed in the truth of his statement cannot be regarded as at all material. The definite assertion of something which is untrue, concerning which the party has no knowledge at all, is tantamount in its effect to the assertion of something which the party knows to be untrue"; and in section 888: "Finally, if a statement of fact, actually untrue, is made by a person who honestly believes it to be true, but under such circumstances

that the *duty* of knowing the truth rests upon him, which, if fulfilled, would have prevented him from making the statement, such misrepresentation may be fraudulent in equity, and the person answerable as for fraud; forgetfulness, ignorance, mistake, cannot avail to overcome the preëxisting *duty* of knowing and telling the truth"; and in section 880: "If, therefore, a representation made prior to the transaction, and directly relating to it, is of such a character that it would naturally and reasonably induce or tend to induce any ordinary person to act upon it, and enter into the contract or engage in the transaction, and is in fact followed by such action on the part of the other person, then it will be presumed that it was made for the purpose and with the design of inducing that person to do what he has done—that is, to enter into the agreement or engage in the transaction. The design will be inferred from the natural and necessary consequences."

*Justice Hoke,* speaking for the Court, recognizes this doctrine in *Modlin v. R. R.,* 145 N. C., 226, as to the effect upon the principal of the false representations of an agent, and says: "It is well established that one who intentionally and positively asserts a fact to be true of his own knowledge, when he does not know whether it is true or false, is as culpable, in case another is thereby misled or injured, as one who makes an assertion which he knows to be untrue"; and again, in *Whitehurst v. Insurance Co.,* 149 N. C., 276: "And it is not always required, for the establishment of actionable fraud, that a false representation should be knowingly made. It is well recognized with us that, under certain conditions and circumstances, if a party to a bargain avers the existence of a material fact recklessly, or affirms its existence positively, when he is consciously ignorant whether it is true or false, he may be held responsible for a falsehood; and this doctrine is especially applicable when the parties to a bargain are not upon equal terms with reference to the representation, the one, for instance, being under a duty to investigate, and in a position to know the truth, and the other relying and having reasonable ground to rely upon the statements as importing verity."

Applying these principles, I think it clear that there was some evidence to be submitted to the jury.

Under the principles announced by Mr. Pomeroy, the representations are presumed to have been made with the purpose of having them acted on, and it is not necessary to show actual knowledge of falsity.

The representations are fraudulent if made recklessly and without knowledge as to whether they are true or false, and in our case 1,000 acres were represented to belong to the plaintiff which he did not own, and the representations were made by the plaintiff, whose duty it was to know, to a stranger.

Fraud in equity has a wider significance than it has at law, and if it cannot be proven by circumstances, the courts will be powerless to trace it or remedy its wrongs.

Mr. Bispham says, section 197: "From the earliest times down to the present day the wrongs inflicted by *covin* (to use the ancient term) have appealed with peculiar force to the conscience of chancellors; and probably no field of remedial law has more extended boundaries, or has yielded more substantial fruits of justice, than that which, in equity jurisprudence, is embraced under the title of fraud. . . . The courts of equity have always avoided, circumscribing the area of their jurisdiction in such cases by precise boundaries, lest some new artifice, not thought of before, might enable a wrongdoer to escape from the power of equitable redress. 'The Court,' said *Lord Chancellor Hardwicke,* in *Lawley v. Hooper,* decided in 1745, 'very wisely hath never laid down any general rule beyond which it will not go, lest other means for avoiding the equity of the court should be found out.' "

There is another principle, recognized many times in this Court and in other jurisdictions, upon which I think the judgment ought to be affirmed, and that is, "that where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence or by his negligent conduct made it possible for the loss to occur, must bear the loss." *R. R. v. Kitchin,* 91 N. C., 44; *R. R. v. Barnes,* 104 N. C., 27; *Medlin v. Buford,* 115 N. C., 272; *Rollins v. Ebbs,* 138 N. C., 145; *Bank v. Oil Mills,* 150 N. C., 722; *Bowers v. Lumber Co.,* 152 N. C., 607.

In the *Medlin case, Shepherd, C. J.,* says: "It is a general and just rule that when a loss has happened which must fall on one of two innocent persons, it shall be borne by him who is the occasion of the loss, even without any positive fault committed by him, but more especially if there has been any carelessness on his part which caused or contributed to the misfortune."

In the *Rollins case Justice Hoke* applies the doctrine to the law of agency, and quotes with approval from 2 Cyc., 159, that, " 'This rule is founded not only upon that principle of general jurisprudence which casts the loss, when one of the two equally innocent persons must suffer, upon him who has put it in the power of another to do the injury, but also upon that rule of the law of agencies which makes the principal liable for the acts of his agent, notwithstanding the private instructions of the principal have been disregarded, when he has held that the agent had a position of more enlarged authority.' This principle finds support in well-considered adjudications in this State and elsewhere. *Gwyn v. Patterson,* 72 N. C., 189; *R. R. v. Kitchin,* 91 N. C., 39; *Humphreys v. Finch,* 97 N. C., 303," and in the *Bowers case, Justice Walker,* after saying that whenever one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion the loss must sustain it, quotes *Lord Holt* as follows: "For as somebody must be a loser by this deceit, it is more reasonable that he who employs and puts a trust and confidence in the deceiver should be the loser, than a stranger."

Apply this principle to the facts. The plaintiff lived on the land he was selling, and the defendant knew nothing of the boundaries. The defendant's agent asked the plaintiff to furnish some one who could point out the lines. The plaintiff selected Sam Jones and said he was familiar with the lines. Jones went with the defendant's agent and made a false representation as to the boundary, which was relied on, causing damage. Who ought to bear the loss? In my opinion, the law answers, the plaintiff, Tarault, who first reposed confidence in Jones, although he may have intended no wrong.